HÉCTOR L. VÁZQUEZ ET AL., Plaintiffs and Appellees, v. HÉCTOR SÁNCHEZ, S. EN C. and AMERICAN SURETY COMPANY OF NEW YORK, Defendants and the former Appellant.

No. 59.    Decided May 28, 1962.

---

*Daniel Pellón Lafuente* for appellant. *Joshua Hellinger* for Mary Sánchez Vázquez.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

Mr. Justice Santana Becerra delivered the opinion of the Court.

On July 15, 1948, Héctor Vázquez and his wife, Mary Sánchez, filed in the former District Court of San Juan an amended complaint for damages against the special partnership Héctor Sánchez, *S. en C.*, and American Surety Co. Judgment was rendered on December 26, 1950, ordering the defendants to pay $21,360.25 to the community partnership constituted by the plaintiffs, the American Surety being bound to pay up to its policy limit of $10,000, the costs, and $2,000 for attorney's fees. The court concluded that the damages sustained by the plaintiffs resulted from an automobile accident due solely and exclusively to the negligence of an employee of the defendant partnership, Héctor Sánchez, *S. en C.*, in the discharge of his employment as ice distributor.

The American Surety deposited the sum of $13,962.77 in satisfaction of its liability. Codefendant Héctor Sánchez, *S. en C.*, appealed (appeal 11,243) and the appeal was dismissed on May 22, 1958. Several days later Mary Sánchez appeared before the trial court and alleged that she had obtained a judgment of divorce in the State of Alabama, which sanctioned an agreement with her husband whereby she would be entitled to 75 per cent of the unpaid balance of $9,397.48 of the judgment. She moved the court to issue an order dividing the unpaid judgment so that she would be entitled to $7,048.11 and her former husband to the difference.

On June 20, 1958, the San Juan Part of the Superior Court ordered that the judgment be amended setting forth that three fourths corresponded to the appearing party therein, Mary Sánchez, and that she could execute separately and in her favor the unpaid balance of the judgment up to the said amount. On July 10 there was issued a writ of execution of that part of the judgment, which was returned unserved by the marshal because there was no property. On

July 22 the plaintiff requested that the defendant be summoned to testify with respect to its properties, and on September 3, 1958 the trial court ordered that judgment for the sum of $7,048.11 be entered against partner Héctor Sánchez and in favor of Mary Sánchez. It was stated that Héctor Sánchez, as managing partner of the defendant partnership, had testified that the partnership did not own property of any kind on which to levy the attachment. Reconsideration having been sought, the trial court upheld the obligation of Héctor Sánchez to answer with his private property for the payment of the said judgment. We issued certiorari to review that order.

██ The appellant maintains that the court could not amend the judgment after having been affirmed [dismissed] by this Court. We do not stop at this point because there was no substantive amendment of the judgment which could alter the order. Judgment being in favor of the community partnership, the trial court's action had no effect other than to cause to appear in the record of the case the portion corresponding to each spouse upon liquidation of the partnership by virtue of the divorce decree. We do not stop either to consider the contention that the trial court could not order the entry of judgment for Mary Sánchez and against appellant Héctor Sánchez without his having been sued because, although it was so ordered, what was decided at law and constitutes the problem herein was that, there being no property of the defendant partnership, the judgment against the latter could be executed on the private property of partner Héctor Sánchez.

The amended complaint alleged that defendant Héctor Sánchez, *S. en C.* was a special copartnership organized in January 1947 and was engaged, among other things, in the manufacture of ice, under the name of Puerto Rico Ice, Inc., of which the appellant herein, Héctor Sánchez, was managing partner, and Gabriel Espasas, special partner. That averment was expressly admitted in the answer. In an affidavit

to an interrogatory, Héctor Sánchez stated that he was a *businessman* and managing partner of Héctor Sánchez, *S. en C.* In view of the foregoing, and there being no other facts in the record to show otherwise, we believe and we so hold that the partnership was a mercantile partnership.[1]

Section 104 of the Code of Commerce (1932 ed.) provides that all the members of the general copartnership, whether or not they are managing partners of the same, are personally and jointly liable *with all their property* for the results of the transactions consummated in the name and for the account of the partnership, under the signature of the latter, and by a person authorized to make use thereof. As respects the special copartnership, such as that herein, § 125 provides that all the members of the copartnership, be they or be they not managing partners of the limited copartnership, are jointly and severally liable for the results of the transactions of the latter *in the same manner and to the same extent as in general copartnerships*, as set forth in § 104. This means that the general partners, whether or not they are managing partners of the special partnership, are also solidarily liable with their private property for the transactions of the partnerships. Also bearing on the problem before us is § 156 of that Code which provides that the private property of the general partners which is not included in the assets of the copartnership when it is established can not be seized for the payment of the obligations contracted by the copartnership until after the common assets have been attached.

We are concerned with an obligation of the partnership itself by virtue of a judgment holding it liable for extra-

---

[1] If it was a civil partnership, other rules would be taken into consideration. Section 1859 of the Civil Code (1930 ed.). Although the Spanish textwriters are agreed that in the civil partnership the partners' liability is not solidary but rather joint, they disagree vigorously as to whether or not the partners shall be liable, although jointly, with their private property for the partnership debts, the Code being silent on the matter. SANTAMARÍA sums up the criteria and agrees with one of them: II *Comentarios al Código Civil* 722 (1958).

contractual fault, in view of the liability incurred under § 1803 of the Civil Code for acts of third persons with respect to the owners or directors of an establishment or enterprise for the damages caused by their employees in the service of the branches in which they may be employed, or on account of their duties.[2]   This is not the case, therefore, of a contractual obligation of the partnership.   The problem in this case hinges fundamentally on this point, that is, whether the provisions of § 104 of the Code of Commerce apply to this type of noncontractual liability.   Cases such as *Sucrs. of M. Lamadrid & Co.* v. *Torrens, Martorell & Co.*, 28 P.R.R. 824 (see 27 P.R.R. 551); *Gregory* v. *Treasurer*, 24 P.R.R. 87; *Acha* v. *District Court of Ponce*, 31 P.R.R. 144; *Morales* v. *González & Co. et al.*, 35 P.R.R. 710, particularly the *Lamadrid* case, are of no aid because they do not deal with extracontractual liability.

From an examination of the judgments of the Supreme Court of Spain, as far as we have been able to search in connection with § § 267 and 352 of the Code of Commerce of 1829 and their counterparts, § § 127 and 237 of the Code of 1885 (§ § 104 and 156 of our Code, 1932 ed.), we have been unable to find a case, according to the facts, of a noncontractual obligation of a partnership.[3]   Likewise, the textwriters whom we have had occasion to consult do not men-

---

[2] The Latin doctrine also discusses the question whether the juridical entity is directly liable for Aquilian fault, since, it being a fiction, it must act through natural persons whether they incur fault or not, although in the case of managers it may be *"in eligendo"* or *"in vigilando."* BORRELL MACÍA refers to it in his chapter entitled *"Responsabilidad de las Personas Jurídicas y de sus Administradores,"* in *Responsabilidades Derivadas de Culpa Extracontractual Civil* 176 (2d ed. 1958).   See, also, GARRIGUES, I–1 *Tratado de Derecho Mercantil* 568–69 (1947).   In this case the judgment rendered against the partnership as such became final and is not open to any discussion.

[3] Judgments of December 17, 1873;  June 13, 1883;  January 8, 1881; November 15, 1898;  Decision of the General Directorate of Registries of May 23, 1898;  Judgments of March 27, 1895;  November 20, 1896;  June 23, 1903;  June 20, 1883;  November 27, 1927;  July 6, 1912;  December 27, 1945.

tion, in discussing these sections or referring in general to the partner's liability, the case of an obligation of the partnership arising from Aquilian fault, although, on the other hand, neither in their expositions nor in the jurisprudence have we been able to find any specific expression to the contrary to the effect that the partner's liability under § 104 resulting from the operations, or under § 156, excludes an extracontractual obligation of the partnership such as that involved in this case. GARRIGUES, *op. cit.*, discusses the matter very superficially, and neither is the problem specific, in stating that "the use of the partnership's signature by a partner representing the same in contractual operations is not a necessary condition to bind the partnership with respect to a third party." "The representative," he says, "also binds the partnership for his unlawful acts (acts arising from fault or negligence, § 1902 of the Civil Code), provided they are performed in the course of the partnership operations." He refers, as may be noted, to the unlawful or negligent act of the partner himself which would bind the partnership, but it could bear some relation to the problem before us, inasmuch as the civil doctrine is agreed that the responsibility of the manager of an enterprise (a managing partner, for example) for the acts of his agent or employee is not subsidiary, but primary and direct, presumed prima facie by the law, under the assumption of fault *"in eligendo"* or *"in vigilando."* Section 1803 of the Civil Code, 1930 ed. Although a contrary view has been the object of discussion with respect to the partner's or manager's fault occurring in the course of the operations, the prevailing criterion is that the partnership shall be liable. As explained in footnote 2 *ante*, the partnership's liability in this case is not open to discussion.

■ The principle embodied in § 104 of the Code of Commerce holding all the general partners solidarily liable with all their property for the results of the partnership transactions is the essential characteristic which, by reason of its

origin and history, distinguishes the general copartnership from other types of associations or companies.[4]

The *Ordenanzas de Bilbao* of 1737, ch. X, par. XIII(a), embodied the concept of unlimited liability: "All parties having an interest in a company shall be required to credit, and to duly charge to losses or profits any business transacted by each member, in the name of all of them, with other persons and dealers not members of the company, each absorbing the losses which may be sustained, up to the amount of the capital stock, and the gains realized or which may be realized from the total capital stock of the company; provided, that the member or members under whose signature the company operates shall be liable, in addition to the capital stock and profits which may correspond to them therein, *with all his or their remaining property*, acquired or which may be acquired, for the payment of all losses, regardless of whether they or any of them made any con-

---

[4] In connection with the general copartnership, Professor RODRIGO URÍA says in *Derecho Mercantil* 113 *et seq.* (2d ed. 1960), that it is the oldest of the commercial companies created in the Middle Ages as an evolutionary form of the family hereditary communities which continued to operate the paternal commerce, and at the beginning it included only those persons related by blood. In its evolution, although it admitted strangers, it maintained the personal character of mutual confidence, solidarity, and unlimited liability among all its members. He considers it as a *labor community* in which, unless otherwise agreed upon, all the partners have power to manage the affairs. GARRIGUES, p. 511, attributes the same origin to the merchants' families which later become a work unity in which the element of mutual confidence prevails. He says that some attribute the element of solidary liability to the indivision of the inheritance in which the children were liable personally for the business debts of the parents as successors of their personality; others, that the partners bound themselves jointly, the presumption of solidarity being inferred in the debts; others, from the mutual agreement of the partners or of the community of the firm. The original family relationship, he says, become contractual without losing the particular characteristic of the family relationship when the business was operated jointly by the father and his children, or by the brothers among themselves.

In 3 *Manual de Derecho Mercantil* 227 *et seq.*, LORENZO BENITO also traces this partnership back to the Middle Ages as a result of the commercial development of the Italian republics after the Crusades, and states: "However, the mercantile practice sees to it that this be slowly modified; and, by a series of senseless gradations, it is admitted that

tribution to the company's capital stock upon becoming a member." XII *Códigos Españoles, Nueva Recopilación* 1851.

The Code of 1829 provided— § 267, counterpart of § 127 of 1885 (104)—that the partners shall be solidarily liable for the results of the operations transacted in the name and for the account of the partnership, under its registered signature and by a person authorized to conduct the business. The Spanish § 127 of 1885 expressly interpolated *"with all their property,"* which historically it was so. In this connection, BENITO states as follows in *op. cit.* at p. 234: "And the partners shall be liable personally, unlimitedly, and solidarily for the *partnership obligations,* because only then can it be considered that the union of the partners as respects third parties is sufficiently strong for the company's credit to attain the maximum possible value in the market, since

---

the partner who contracts on behalf of the partnership bears the representation of each of its partners, even though he does not have a power of attorney which presumably exists by fiction. By another fiction it is admitted that the partner who signs with the names of all the partners represents them, and the contract has the same force as if it were signed personally by all of them, and that is how the firm name comes to life. And, lastly: by another fiction the solidarity covenant is presumed to exist in every contract subscribed by the partner who lawfully uses the firm name, and the general partnership is then created as it has been handed down to the modern mercantile legislations."

Referring to the matter at p. 102 *et seq.* of *Tratado Práctico de Sociedades Mercantiles* (1948), GAY DE MONTELLÁ attributes the same medieval origin to the general copartnership in the families of the large cities which devoted to commerce their hereditary property, still undivided, in which the brothers-heirs continued the paternal business under the same roof, house community, which was the first sign of the existence of an *unlimited* commercial partnership. When the family economic resources were not sufficient, relatives and friends related by a social contract collaborated. The mutual agency granted by the partners to transact the business gave rise to the juridical reason based on the solidary and unlimited guarantee. To such an extent, says MONTELLÁ, are both elements, solidarity and unlimitedness, important in characterizing the general copartnership that it is sufficient that this solidarity exist among the members in order that there be general copartnership, even if there is no distinguishing *firm name.* Because the solidarity in the payment of partnership debts does not exist in any other form of commercial or civil company.

that would imply the consecration of the formula underlying every partnership contract of this type: one for all and all for one."

■■ In view of the origin and historical development of the general copartnership, the characteristic which makes it unique in the law and distinguishes it from the other institutions, which is the solidary and unlimited liability of its members, as well as the reason, also historical, of the economic mandate for such type of liability with respect to a third party; and considering the text of §§ 104 and 156, in the absence of an express provision to the contrary, there would be no reason for considering the partner's solidary and unlimited liability as being limited only to the company's obligations or debts of a contractual nature. Section 156 (Spanish § 237) which according to MONTELLÁ is ill-fitted in the Code and better suited to the general partners' liability, must be considered *in pari materia* with § 104, which deals with the manner of exacting such liability from the partner by a third party. This section binds the partner's private property, after the assets are attached, *to the payment of the partnership's contractual obligations*, without distinguishing either between contractual and noncontractual obligations.

On the other hand, it is a known fact that according to § 1042 of the Civil Code obligations are also created by law, and this is an obligation which the general partners can not elude, nor are they free to covenant otherwise in violation thereof as respects third parties. In the judgment of the Supreme Court of Spain of December 27, 1945, the general rule laid down is that the obligation imposed by § 127 of the Code of Commerce (§ 104) on the members of the general copartnership for the partnership operations, *is the same obligation as that resulting from these operations for the company*, and if the latter eludes its obligation the partners can not be held liable by virtue of that section. *A contrario sensu*, if in the light of this rule liability is demandable from the company, it would be demandable from the partners.

We have seen in the case at bar that there exists a liability or obligation on the part of the company by virtue of a judgment ordering it to pay damages. If the partnership fails to discharge that debt or obligation, which undoubtedly was the result of the partnership operations, the appellant must be liable pursuant to § 104. The fact that this section subjects such liability to the results of the operations transacted in the name and for the account of the company, under its signature and by a person authorized therefor, does not mean, as contended by the appellant, that only contractual operations are involved. Those provisions must be construed also in the light of the provisions of the following § 105, to the effect that the partners who are not duly authorized to use the firm name shall not bind the company by their acts and contracts even though they execute them in its name and under its signature. In view precisely of the unlimited solidarity in this type of partnerships in which all the general partners, whether or not they intervene in the operations, shall be liable solidarily and unlimitedly, § 104 requires that it be so whenever the operations are partnership operations and are carried out by persons authorized to do so. It is not impossible to incur extracontractual or Aquilian fault, as was the case here, in the partnership operations and in the course thereof. On the other hand, and although the appellant was not joined as defendant in the action for damages, which he could have been, together with the partnership, he was the only managing partner, the other partner not having intervened because he was a special partner, and as such he was the person responsible, first in having chosen, and then in supervising, the employee who caused the damage in the course of employment, wherefore there is no question that the operation was not, properly speaking, a partnership operation transacted under the firm name by a person authorized therefor.

Lastly, the requirement of attachment was met in this case. Section 156. According to the Spanish judgments

and our own cases of *M. Lamadrid* and *Morales* v. *González*, *supra*, the appellant could have been sued in the beginning together with the partnership, although he was not. Nor was there any obligation to include him. It is well settled that the partner's liability in that situation is subsidiary or secondary to that of the partnership and not a primary liability. Although the appellant herein was not sued in the beginning, he was heard on the benefit of attachment, since the partnership was summoned and he himself offered the evidence in court to the effect that the partnership of which he was managing partner had no property. It was not necessary for the creditor to bring at that time a separate action against him. We had said in *Lamadrid & Co.* that the partner's position in such situation is the same as that of a surety. Proceedings similar to those provided in civil procedure may be instituted in the case of such sureties.

In view of the foregoing, the writ of certiorari issued will be quashed and the judgment rendered by the San Juan Part of the Superior Court on October 14, 1958, ordering the attachment of the remainder of the judgment on personal property of the appellant, shall remain in full force.